**MacMILLAN BLOEDEL LIMITED and MacMillan Bloedel, Inc., Plaintiffs-Appellants,**

v.

**The FLINTKOTE COMPANY, Defendant-Appellee.**

No. 84–2409.

United States Court of Appeals, Fifth Circuit.

May 6, 1985.

582

O.J. Weber, Beaumont, Tex., Nicholas L. Coch, New York City, for plaintiffs-appellants.

Stephen W. Axxin, Douglas B. Adler, New York City, Harry Reasoner, Houston, Tex., for defendant-appellee.

Before GOLDBERG, RUBIN, and HILL, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A buyer of corporate assets settled antitrust claims based on charges that, before as well as after acquiring the assets, it had conspired with a number of others, including the seller of those assets, to fix the prices of their products, thus violating the antitrust laws. It seeks to recover the part of its payment that it considers to be the seller's share of the amounts paid to settle claims for damages suffered before the acquisition because the sale agreement required the seller to hold the buyer harmless from claims arising from the seller's acts before the sale. Finding that the buyer's liability did not arise from the seller's acts but from its own joint and several liability for all damages suffered by the antitrust victims, we affirm the district court's summary judgment.

I.

This is yet another of the suits generated by the Corrugated Container antitrust litigation, MDL 310.[1] MacMillan Bloedel, Limited, MacMillan Bloedel, Inc,. MacMillan Bloedel Containers, Inc., and MacMillan Bloedel Packaging, Ltd. (together referred to as MacMillan Bloedel) were among the defendants named in that action and in the opt-out cases. The claimants in the corrugated container class action alleged that the twenty-two defendants had engaged in

a conspiracy to fix the prices charged purchasers of corrugated sheets and containers from January 1, 1960, through January 25, 1978. Thereafter, those twenty-six claimants who had exercised their option not to participate in the class action filed separate civil treble damage actions against MacMillan Bloedel alleging similar violations. MacMillan Bloedel was also named as defendant in a state action alleging similar violations. Flintkote was not named as a defendant in any of the complaints.

MacMillan Bloedel entered the corrugated container business in 1966 as the owner and operator of plants in Adenton, Maryland, and Jersey City, New Jersey. In 1972, MacMillan Bloedel purchased from the Flintkote Company a group of assets including ten corrugated container plants known as the Hankins and Western Packaging Division (the Hankins assets), for $24,000,000. In the sale contract, Flintkote agreed to "indemnify" MacMillan Bloedel "and save them harmless from, any and all liabilities, contingent or otherwise ... with respect to and arising from the operations of [those assets] by [Flintkote] prior to the closing date...." (Section 6d). Flintkote also made representations and warranties to MacMillan Bloedel and agreed to "indemnify and hold harmless [MacMillan Bloedel] against ... all ... claims ... which may arise out of or be in respect of the breach or violation of any of [Flintkote's] representations, warranties, covenants or agreements...." (Section 11(b)).

Following the acquisition, MacMillan Bloedel operated both the plants it had previously owned and the Hankins assets. Flintkote continued in its remaining businesses and did not engage in the sale of corrugated container products.

After this litigation began, MacMillan Bloedel notified Flintkote of the various

1. *See, e.g., In re Corrugated Container Antitrust Litigation,* 1980–1 Trade Cas. (CCH) ¶ 63, 163 (S.D.Tex.1979), *affirmed in part and remanded for additional findings,* 643 F.2d 195, 202–06 (5th Cir.1981), *on remand,* 1981–1 Trade Cas. (CCH) ¶ 64, 114 (S.D.Tex.1981), *affirmed after* remand, 659 F.2d 1322 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 1012, 102 S.Ct. 2283, 2308, 73 L.Ed.2d 1294 (1982); *In re Corrugated Container Antitrust Litigation,* 556 F.Supp. 1117, 1141–57 (S.D.Tex.1982).

suits and sought indemnification from Flintkote. Flintkote denied liability for indemnity and refused to participate in the defense of any of the suits.

Although it denied liability for any antitrust violations, MacMillan Bloedel paid $8,440,000 to settle the claims of the plaintiffs in the corrugated container class action and $3,710,100 to settle the claims in the related opt-out actions. The class-action settlement was approved by the court as part of a pattern of settlements in which the twenty one other class action defendants paid a total of $298,000,000. Each settling defendant paid a sum determined by multiplying its percentage share of the corrugated products market by a stipulated monetary amount per percentage point of market share. The amount of the settlement in each of the opt-out actions was determined by reference to a statistical base period. A fixed percentage was then applied to the amount of sales made in the base period to determine the settlement for the conspiracy period of 1960–1978. Various factors such as timing of the settlement, risk of liability, available evidence produced in the prior cases, and like factors were used to determine the percentage.

Flintkote contends that MacMillan Bloedel paid nothing to settle the antitrust claims arising out of Flintkote's operation of the Hankins assets before June 1972, and that whatever MacMillan Bloedel paid was attributable to its own separate operations either of the Hankins assets after their acquisition, or to its separate operations before acquisition. MacMillan Bloedel argues that some part of the payments it made was for Flintkote's pre-acquisition conduct although the exact amount paid for Flintkote's liability was a "triable issue." The record contains some support for Flintkote's position for it indicates that, although Flintkote was not a defendant in the class action, it offered to pay $220,000 plus interest, a total of $319,377.02, to the class if the class refrained from suing it.

Flintkote argues that this offer resulted from the class's agreement to eliminate pre-June 1972 sales from MacMillan Bloedel's settlement. It also contends that MacMillan Bloedel changed its approach in subsequent settlement negotiations. Because the settlements of the opt-out cases were based on sales to settling plaintiffs for 1969–1977, and the amount of Flintkote's sales to these plaintiffs during the period was comparatively small, MacMillan Bloedel did not (a) inform any of the counsel for the opt-out plaintiffs that Flintkote remained responsible for its own operations, or (b) attempt to eliminate pre-June 1972 sales from the settlement calculations.

The district court held that whether MacMillan Bloedel's payments arose, in part, from Flintkote's operation of the Hankins assets is subject to factual dispute. For purposes of this appeal, we assume, most favorably to MacMillan Bloedel, that the payments did cover in part damages allegedly suffered as a result of Flintkote's joinder in the price-fixing scheme while it was still the owner and operator of the Hankins assets. This assumption permits us to determine the validity of the summary judgment on the basis that disputed facts are weighed in the manner most favorable to the opponent of the summary judgment.[2] If the disputed facts are thus considered, there can be no genuine dispute about the factual basis on which the judgment rests.[3]

MacMillan Bloedel contends that Flintkote is liable to it for some part of the amounts paid because part of the payment was to settle claims for damages incurred before 1972, when Flintkote operated the Hankins assets. It grounds these claims on: (1) Flintkote's breach of its warranties and representations in the sale agreement; (2) Flintkote's liability for indemnity under

**2.** *Roberts v. Louisiana Downs, Inc.,* 742 F.2d 221, 223 (5th Cir.1984); *Walker v. U-Haul Co. of Mississippi,* 734 F.2d 1068, 1069–70 (5th Cir. 1984).

**3.** Fed.R.Civ.P. 56(c). *See Simmons v. Lyons,* 746 F.2d 265, 267 (5th Cir.1984); *Walker v. U-Haul Co. of Mississippi,* 734 F.2d 1068, 1070–71 (5th Cir.1984); *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1123 (5th Cir.1978).

§ 6(b) of the agreement; and (3) the principles of restitution and of equitable subrogation.

The district court found that MacMillan Bloedel's alleged involvement in the price-fixing scheme preceded its purchase of the Hankins assets. It disallowed MacMillan Bloedel's claims insofar as they were based on the theories of benefit-of-the bargain and equitable subrogation because MacMillan Bloedel's potential liability for antitrust activities was based upon its own conduct as a coconspirator and was not affected by its purchase of Hankins. The court found that the sale agreement provided for indemnification for violation of the antitrust laws, but it rendered summary judgment in favor of Flintkote on the basis that allowing indemnification would be contrary to the policy underlying the federal antitrust laws.

We do not find it necessary to define the policy of the antitrust laws or to decide whether that policy would invalidate some or all indemnity agreements made in connection with the sale of a business because we differ with the district court on the scope of the agreement as applied to the facts here. The amount that MacMillan Bloedel seeks to recover here was paid because, as an alleged co-conspirator, it was a joint tortfeasor, liable jointly and severally for all of the damages sustained by virtue of the conspiracy without regard to the liability of other conspirators. It would have been liable for the same amount had it never purchased any assets from Flintkote. Its liability, therefore, arose neither from Flintkote's pre-acquisition torts nor from Flintkote's breach of warranty.

As MacMillan Bloedel emphasizes in its brief, it seeks to recover *only* the portion of the amount paid "for losses attributable to Flintkote's pre-agreement conduct." This is the amount that it might have been able to recover from Flintkote as a jointly liable tortfeasor if contribution among conspirators who violate the antitrust laws were allowable. In *Texas Industries v. Radcliffe Materials, Inc.,*[4] however, the Supreme Court held there is no basis in either federal statutory or common law for allowing federal courts to fashion the right to contribution among participants in an antitrust conspiracy. The sale agreement affords no basis for contribution in the guise of contractual indemnity.

## II.

The agreement between Flintkote and MacMillan Bloedel provides that New York law is to be applied in interpreting it. This determines our rule of decision.[5] We review the district court's interpretation as a matter of law, taking a fresh look at the meaning of the contractual provisions.[6]

The district court correctly read the agreement to manifest "the intent of the parties to indemnify MacMillan Bloedel for losses sustained ... which are attributable to the operation of Hankins by [Flintkote] prior to the closing date of the Agreement." The court also properly concluded that the agreement included "indemnification for violations of antitrust laws." These observations, however, do not decide whether the agreement required indemnification for the payments that MacMillan Bloedel seeks here to recover.

The universal common-law rule is that each of two or more persons whose tortious conduct causes harm is liable to the injured party for the entire harm[7] and each may, therefore, be sued separately

---

4. 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981).

5. Restatement (Second) of Conflict of Laws § 187 (1971). *See* E. Scoles & P. Hay, Conflict of Laws § 18.1 (1982).

6. *Carpenters Amended & Restated Health Benefit Fund v. Holleman Construction Co.,* 751 F.2d 763, 766 (5th Cir.1985); *Paragon Resources v. National Fuel Gas Distribution,* 695 F.2d 991, 995 (5th Cir.1983).

7. Restatement (Second) of Torts § 875 (1979); 1 F. Harper and F. James, The Law of Torts, § 10.1 (1958); Prosser and Keeton on Torts § 47 (5th ed. 1984).

and held liable for all of the damage.[8] This principle applies to antitrust liability.[9]

MacMillan Bloedel contends, as it has maintained throughout the antitrust litigation, that it did not engage as a conspirator in price-fixing, but whether or not MacMillan Bloedel was in fact a coconspirator is immaterial. It seeks to recover amounts paid to settle the claims because of its potential liability. It seeks to recover part of what it paid from Flintkote on the theory that the settlement was reasonable and that Flintkote owes part of that settlement. Given its own premise, MacMillan Bloedel must have paid to both the class and the opt-out plaintiffs a sum for which it might have been liable as a coconspirator.

Completely inconsistently, MacMillan Bloedel contends that there is a dispute as to whether its "alleged involvement in the price-fixing scheme preceded its purchase of" the Hankins assets. There can be no genuine dispute on this issue because MacMillan Bloedel sought and received releases covering the pre-June 16, 1972 period and the settlement of MDL 310 was found to be "fair, reasonable and adequate" based in part on the fact that MacMillan Bloedel faced exposure to liability based on its own pre-June 1972 sales.

We find no substance in the contention that "whether [MacMillan Bloedel] ever controlled the two plants operated by MacMillan Bloedel Packaging, Ltd. (not a party plaintiff herein) prior to the Closing date and were thus aware of any alleged conspiratorial conduct involving the two plants" is a genuine issue of material fact. What is material is that the class action plaintiffs alleged that MacMillan Bloedel itself fixed prices prior to the time it acquired the Hankins assets. Although these plaintiffs chose not to name MacMillan Bloedel Packaging, Ltd. as a defendant in this class action, MacMillan Bloedel's settlement included all claims that might have been asserted against MacMillan Bloedel Packaging, Ltd.

The class action did not allege that MacMillan Bloedel was liable for Flintkote's antitrust liability as a corporate successor. Indeed, the settled common law rule, followed in New York, is that a purchaser of corporate assets is *not* liable for the liabilities of its predecessor that it does not specifically assume.[10] MacMillan Bloedel, therefore, might have been liable for Flintkote's activities before the sale of the Hankins assets only if it had been a coconspirator with Flintkote in the alleged price-fixing conspiracy. That joint liability could be established only by proving that MacMillan Bloedel itself had engaged in antitrust violations before buying the Hankins assets. By definition, if MacMillan Bloedel seeks indemnification under this theory, it seeks to recover for liability arising from its own alleged conspiratorial activities either before or after it purchased the Hankins assets.

MacMillan Bloedel could indeed have been held liable, jointly and severally, for all of the damages caused by all of the other twenty-one defendants in the antitrust actions. It might have been held liable in judgment for the damages resulting from fixing prices on its own products as well as for those suffered from Flintkote's price fixing had it never purchased the Hankins assets. None of MacMillan Bloedel's liability, therefore arose from the operation of the Hankins assets by Flint-

---

8. Prosser and Keeton on Torts, *supra* § 47.

9. *Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.,* 604 F.2d 897, 903–04 (5th Cir.1979); *Soloman v. Houston Corrugated Box Co.,* 526 F.2d 389, 392 n. 4 (5th Cir.1976). *See Lawler v. National Screen Service Corp.,* 349 U.S. 322, 329–30, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955).

10. *See, e.g., Kemos, Inc. v. Bader,* 545 F.2d 913, 915 (5th Cir.1977) *citing, inter alia* 15 Fletcher Cyclopedia Corporations § 7122 (perm. ed. 1973); *Groover v. West Coast Shipping Co.,* 479 F.Supp. 950, 951 (S.D.N.Y.1979); *Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834, 838–39 (S.D.N.Y.1977); *Shane v. Hobam, Inc.,* 332 F.Supp. 526, 527–28 (E.D.Pa.1971); *Copease Manufacturing Co. v. Cormac Photocopy Corp.,* 242 F.Supp. 993, 1013–14 (S.D.N.Y.1965); *Hartford Accident & Indemnity Co. v. Canron, Inc.* 43 N.Y.2d 823, 373 N.E.2d 364, 402 N.Y.S.2d 565 (1977).

kote prior to June 1972, save in the most indirect fashion. The sole possible influence of Flintkote's operations on MacMillan Bloedel's settlement (not its potential judgment liability) was to increase the amount MacMillan Bloedel agreed to pay for a release, and that can be supposed only on the assumption that it can establish its version of the basis on which the settlement was calculated.

With some plausibility, MacMillan Bloedel relies on the interpretation of an indemnity clause in *Ramsey v. Georgia-Pacific Corp.*[11] and *Barron v. United States*[12] as a basis for recouping sums paid for joint and several liability. In each of these cases, an independent contractor agreed to indemnify its employer for negligence in the course of performing the contract that caused injury to the independent contractor's employee. The contractual language used in each of the agreements made it reasonable to conclude that the indemnification provisions might have been intended to cover joint and several liability for negligent acts. Indeed, in *Ramsey*, this court did not finally construe the indemnification provisions as a matter of law, but remanded for a hearing on the question of contract construction.[13] On remand, the district court found that the indemnification provisions were invalid, unenforceable and inapplicable to the underlying liability.[14] The purpose of the indemnification provisions of the Hankins Assets Agreement was to protect MacMillan Bloedel from liabilities that "might arise from" its purchase of the Hankins Assets. The liability sought to be recouped here was not that consequence.

Finally, MacMillan Bloedel invokes images of the supposed "disaster" that might ensue if it cannot obtain indemnification from Flintkote: unless a buyer can obtain indemnification for the alleged antitrust violations of the seller, the "purchaser could face enormous potential liability for violations committed by the seller prior to the acquisition." Corporate acquisitions would consequently be "substantially inhibited."

■ The threat is but spectral. As we have noted, a buyer of assets is not liable for the antitrust violations of the seller unless it specifically assumes them. Absent alleged wrongdoing by the buyer, therefore, it faces no liability for antitrust violations committed by the seller. If a buyer acquires ownership of a corporation by buying its stock, the corporation, of course, remains liable for its antitrust violations.

In either context, the parties may seek to provide indemnity to the buyer. When assets are acquired, the agreement may extend to sharing joint and several liability. When stock is acquired, the agreement may cover all undisclosed liability including whatever may be joint and several.

### III.

■ We find no merit in the contention that the antitrust settlements resulted from Flintkote's breach of its representation that it had conducted its business lawfully. Section 11(b) of the sale agreement requires Flintkote to indemnify MacMillan Bloedel for liabilities it would incur as a result of Flintkote's breach of certain representations and warranties made in the agreement. Flintkote represented that it had complied in all material respects with all laws governing its business. The representation, the full text of which is set forth in the footnote [15] is a standard clause de-

**11.** 597 F.2d 890 (5th Cir.1979).

**12.** 654 F.2d 644 (9th Cir.1981).

**13.** *Ramsey v. Georgia-Pacific, supra* 597 F.2d at 894.

**14.** *Ramsey v. Georgia-Pacific Corp.,* 511 F.Supp. 393, 406–07 (S.D.Miss.1981).

**15.** Section 3(m) of the Purchase and Sale Agreement provides:

*Compliance with Laws.* Except as set forth in Exhibit I, [Flintkote] has, to the best of its knowledge, complied in all material respects with all laws, regulations and orders and has obtained all governmental permits or licenses, if any, required by the businesses of the Divisions. Except as set forth in Exhibit I, to the best of [Flintkote's] knowledge, the present uses by it of its properties, and the properties which it leases, used in the businesses of the Divisions do not materially violate any law,

signed to assure the buyer that the assets being purchased were being operated pursuant to applicable local law and regulations at the time of the acquisition. It appears to relate only to such matters as pollution and noise-abatement licensing and the permits and variances needed to operate the assets. Even if this section might be interpreted as a pledge that Flintkote had not violated the antitrust laws, however, the settlement payment was not made as a result of liability imposed on MacMillan Bloedel by virtue of Flintkote's violation for the same reasons that the payment did not arise from breach of the hold-harmless clause.

Section 11(b), like Section 6(d), was intended to provide indemnification to MacMillan Bloedel for liabilities it suffered as a result of the breach of Flintkote's representations. MacMillan Bloedel is not entitled to indemnification under these sections, however, because it did not become liable in this fashion.

▇ If its indemnification claim fails, there is no basis on which MacMillan Bloedel's restitution and equitable subrogation claims can succeed. Due to the joint and several liability of conconspirators, MacMillan Bloedel was already potentially liable for Flintkote's supposed antitrust violations when it purchased the Hankins assets. Because MacMillan Bloedel's potential liability was not affected by its purchase of the Hankins assets, MacMillan Bloedel is not entitled to restitution from Flintkote.[16] MacMillan Bloedel's equitable subrogation theory fails as a matter of law for the same reason.[17] However labeled, MacMillan Bloedel's restitution and equitable subrogation claims are really de-

vices to obtain the contribution that *Texas Industries* does not permit it to seek.

## IV.

MacMillan Bloedel seeks to undermine the summary judgment because it rests in part on the district court's judicial notice of the pleadings, files, and proceedings in MDL 310, the opt-out actions, and the companion criminal prosecutions. The argument rests on Federal Rule of Evidence 201, which applies to judicial notice of adjudicative facts that are not subject to reasonable dispute.[18] MacMillan Bloedel contends that the facts noted by the district court were subject to reasonable dispute, notice of them should not have been taken without formal introduction of evidence, and notice was taken of proceedings to which MacMillan Bloedel was not a party. Finally, MacMillan Bloedel attacks the district court's procedure because Rule 201 entitles a party "upon timely request, to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed."

▇ None of these contentions withstand scrutiny. A court may take judicial notice of related proceedings and records in cases before the same court.[19] In addition, it is not clear what facts noticed by the district court are disputed beyond those on which we have commented. Finally, MacMillan Bloedel did not properly challenge the district court's procedure, for there is nothing in the record to indicate that it filed a motion after the district court took notice seeking an opportunity to be heard concerning the propriety of taking judicial notice. Moreover, there was no reason to

---

regulation or any order. Except as set forth in Exhibit I, no notice or warning from any governmental authority in respect of any material failure or alleged failure by [Flintkote] to comply with any law, regulation or order has been received by [Flintkote].

**16.** *See* Calamari and Perillo, *Contracts* § 15–4, at 574 (2d ed. 1977) ("the basic aim of restitution is to place the plaintiff in the same economic position as he enjoyed prior to contracting.").

**17.** *See, e.g., Medical Malpractice Insurance Association v. Medical Liability Mutual Insurance Co.,* 86 A.D.2d 476, 450 N.Y.S.2d 191, 194 (1st Dep't.1982).

**18.** Fed.R.Evid. 201(b).

**19.** *Missionary Baptist Foundation of America v. Huffman,* 712 F.2d 206, 211 (5th Cir.1983); *State of Florida Board of Trustees of the Internal Improvement Trust Fund v. Charley Toppino and Sons, Inc.,* 514 F.2d 700, 704 (5th Cir.1975).

have the formal introduction of evidence here. As the Advisory Committee Notes on Fed.R.Evid. 201(a) state: "If particular facts are outside of reasonable controversy, [the introduction of evidence] is dispensed with as unnecessary."

For these reasons, the judgment is AFFIRMED.