FEDERAL PAPER BOARD CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 34291-83.        Filed May 16, 1988.

---

*David Sachs,* for the petitioner.

*William S. Garofalo* and *Barbara J. Fazekas,* for the respondent.

WELLS, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE— | Deficiency |
|---|---|
| 12/27/75 | [1]$595,009 |
| 12/30/78 | 595,009 |

After concessions, the issue for decision is whether section 162(g)[2] disallows a deduction for two-thirds of all amounts paid by petitioner to settle antitrust actions

[1]The deficiency determined for petitioner's taxable year ended Dec. 27, 1975, resulted from a reduction of an investment credit carryback from petitioner's taxable year ended Dec. 30, 1978.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

brought under section 4 of the Clayton Act.[3]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner's principal place of business or office was in Montvale, New Jersey, at the time the petition in this case was filed. For all years relevant to this case, petitioner manufactured and sold folding cartons (i.e., bending boxboard containers that are not suitable for liquids), and not milk cartons (i.e., bending boxboard containers that are suitable for liquids).[4]

## Criminal Case and Companion Civil Suit

In February 1976, a criminal action was brought by the United States (hereinafter Government) in the U.S. District Court for the Northern District of Illinois against 23 corporations, including petitioner, and 50 individuals. The Government alleged that those defendants had violated Federal antitrust laws by engaging in a conspiracy to fix the prices of folding cartons. The Government did not allege for purposes of that criminal case, however, that the defendants therein conspired to fix the prices of milk cartons.[5]

In February 1976, the Government also filed a civil enforcement action against petitioner and other parties. Similar to its position in the criminal case, the Government alleged in the civil enforcement action that the defendants had engaged in a conspiracy to fix the prices of folding cartons, and did not allege that there had been a conspiracy to fix the prices of milk cartons.

---

[3]According to respondent, petitioner is one of several taxpayers that have taken conflicting positions with regard to the issue in this case.

[4]For purposes of stipulations, trial, and briefing, the parties stipulated to these definitions of the terms "folding cartons" and "milk cartons," unless it was clear from the context in which the terms appeared that some other definitions should apply. We adopt the same definitions of the terms, unless it is clear from the context in which the terms appear that some other definitions should apply.

[5]Subsequent to the filing of the criminal case, a separate grand jury convened to consider allegations involving milk cartons and did not return any indictments.

In March 1976, petitioner and other defendants in the criminal case were indicted for Federal antitrust law violations that involved folding cartons and not milk cartons. Petitioner pleaded nolo contendere to the charges set forth in the indictment.

In the civil enforcement action, the Government obtained a consent order and injunction against petitioner and other defendants.

## Class Action

During 1976, very soon after the indictment was issued in the criminal case, purchasers of milk cartons, folding cartons, or both types of cartons filed antitrust actions under section 4 of the Clayton Act against petitioner and other carton producers. These actions were consolidated in the U.S. District Court for the Northern District of Illinois (hereinafter District Court). The District Court subsequently determined that the civil antitrust litigation satisfied the statutory requirements for a class action,[6] and certified the litigation as such. The District Court defined the class on whose behalf the class action was maintained as "All persons in the United States (excluding Defendants, their subsidiaries, affiliates, or agents), who purchased folding cartons from any of the Defendants in these actions during the period from January 1, 1960 to December 31, 1974."[7]

Complaints that were filed by purchasers of cartons contained allegations that the defendants engaged in a conspiracy to fix, raise, maintain, or stabilize the prices of folding cartons. The complaints were, in essence, based upon the allegations contained in the indictment issued in the criminal case. Nevertheless, some of the complaints specifically mentioned milk cartons—some of the complaints specifically alleged that the conspiracy included milk cartons, and at least one of the complaints specifically excluded milk cartons. Moreover, plaintiffs that did not specifically allege in their complaints that the conspiracy included milk cartons asserted in the course of the antitrust

---

[6]See Fed. R. Civ. P. 23.

[7]The class initially included indirect purchasers of folding cartons, but was amended on July 15, 1977, to include only direct purchasers of folding cartons. See *In Re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 737-738 (N.D. Ill. 1977).

litigation that the term "folding cartons," as used in their complaints, included milk cartons. Thus, the plaintiffs alleged that the defendants engaged in a single conspiracy to fix the prices of both folding cartons (folding carton claims) and milk cartons (milk carton claims).[8]

On June 24, 1977, the District Court denied a motion filed by certain defendants, not including petitioner, to sever milk carton claims.[9] On June 29, 1977, in response to a motion for reconsideration of its ruling denying the motion to sever milk carton claims, the District Court again refused to sever milk carton claims; this motion for reconsideration was filed by the same defendants that filed the motion to sever milk carton claims. The District Court made clear during the pendency of the litigation that, at least for the initial stages of the litigation, (1) the term "folding cartons" included milk cartons, and (2) the court would not consider the milk carton industry a separate industry from the folding carton industry.

The parties to the class action made various attempts to settle the antitrust litigation. In 1977, a group of defendants, which included petitioner, made a settlement proposal to the plaintiffs in the class action. The proposal provided that each defendant would settle the claims of its own plaintiff-customers and make settlement payments to those customers. The proposal also required the plaintiffs to exclude the sales of settling defendants from the plaintiffs' claims against those defendants that refused to settle. The proposal, however, was rejected by the plaintiffs.

On October 18, 1978, petitioner entered into a settlement agreement with certain plaintiffs (these plaintiffs hereinafter are referred to as settling plaintiffs).[10] The settlement agreement provided for the complete settlement of the

---

[8]We use the terms "milk carton claims" and "folding carton claims" because the parties to this case and to the antitrust litigation used such terms. By using such terms, however, we are not suggesting that there were allegations of one conspiracy involving only milk cartons, and allegations of a second, separate conspiracy involving only folding cartons.

[9]The defendants filing the motion argued, inter alia, that (1) because the milk carton business was distinct from the folding carton business, the addition of the milk carton claims to the antitrust proceedings was improper; and (2) continued joint litigation of the claims involving folding cartons and the claims involving milk cartons would complicate the antitrust litigation and cause prejudice to those defendants required to defend against both types of claims.

[10]Certain plaintiffs excluded themselves from the certified class at some point in time, and therefore did not participate in this settlement agreement. Separate agreements were negotiated with those plaintiffs, and are discussed *infra.*

settling plaintiffs' claims against petitioner "with respect to all purchases of folding cartons including milk cartons." In return, petitioner agreed to deposit cash in the amount of $12 million in escrow for the benefit of the settling plaintiffs, and to issue to the settling plaintiffs subordinated promissory notes in the total principal amount of $5 million and warrants to purchase 181,818 shares of petitioner's common stock. The total fair market value of the consideration provided by petitioner under the settlement agreement was $15,405,487.[11] Of this amount, $1,060,000 represented a payment of legal fees.[12]

Other defendants also each entered into a settlement agreement with the settling plaintiffs.[13] Each settlement agreement, including the agreement between petitioner and the settling plaintiffs, specifically provided that the agreement would not be construed to affect in any manner any joint and several liability of the defendants that did not settle the claims against such defendants—"any putative common law rule or practice, or State or local statute, to the contrary notwithstanding." Amounts paid by other defendants under their respective agreements were deposited in escrow.

Each defendant in the class action individually negotiated with the settling plaintiffs in order to settle the antitrust litigation. Moreover, the defendants did not enter into an agreement between themselves with respect to the manner in which they would share their liability to the settling plaintiffs.[14]

On July 9, 1979, the settling plaintiffs submitted a proposed plan of distribution to the District Court. That plan provided, in essence, that the amounts held in escrow and petitioner's notes and warrants would be distributed to the plaintiffs that filed claim forms. Distributions would be based upon each claimant's purchases of cartons from the

[11]There was no provision in the settlement agreement indicating that petitioner's payment was based upon petitioner's actual sales of folding cartons to its plaintiff-customers.

[12]The parties have stipulated to this allocation.

[13]Certain plaintiffs excluded themselves from the certified class at some point in time, and therefore did not participate in these settlement agreements. Separate agreements were negotiated with those plaintiffs, and are discussed *infra.*

[14]Defendants did, however, enter into an agreement among themselves with respect to the manner in which they would share their liability for various litigation costs incurred in the class action.

defendants in relation to all claimants' purchases of cartons from the defendants (these distributions hereinafter are referred to as pro rata distributions); no distinction was made between purchases of folding cartons and purchases of milk cartons for purposes of the distribution formula.

Later in July 1979, the District Court entered a pretrial order approving the form of a Notice of Hearing on Proposed Class Action Settlements and Proposed Plan of Distribution. The notice set forth the class that the District Court previously certified,[15] but specifically stated that "For purposes of these proposed settlements, folding cartons *include* milk cartons." (Emphasis in original.) The notice also contained a summary of the proposed settlement agreements and the proposed plan of distribution of the settlement fund (hereinafter plan of distribution).

On September 19, 1979, the District Court granted final approval of the settlement agreements entered into by the defendants with the settling plaintiffs, and also granted final approval of the plan of distribution.

Amounts held in escrow were distributed to the settling plaintiffs during the period between 1980 and 1983. In 1980, petitioner's notes and warrants were distributed to the settling plaintiffs pursuant to the plan of distribution;[16] however, settling plaintiffs with claims below a certain dollar amount did not receive notes and warrants because notes and warrants were not issued in fractional amounts.

During the relevant period under the plan of distribution, the aggregate sales of milk cartons by all the settling defendants to the settling plaintiffs constituted 23.6 percent of the aggregate sales of folding and milk cartons by such defendants.

### Opt-Out Cases

Approximately 16 plaintiffs chose not to participate in the settlement agreements between the defendants and the settling plaintiffs (these nonparticipating plaintiffs hereinafter are referred to as opt-out plaintiffs). The opt-out

---

[15]See this opinion, *supra,* for the defined class in the class action.

[16]Thus, pro rata distributions were made to purchasers of folding cartons, milk cartons, or both types of cartons.

plaintiffs chose, instead, to negotiate on their own behalves with the defendants.

On May 31, 1979, certain defendants, not including petitioner, renewed their motion to sever milk carton claims.[17] The District Court denied the motion, but made clear that it could "sever out the milk cartons any time in the course of the trial when it appeared * * * that it [was] prejudicial to keep them in."[18]

Prior to settling with the opt-out plaintiffs, most of the defendants signed two agreements that established the manner in which their liability to the opt-out plaintiffs would be allocated among such defendants (this type of agreement hereinafter is referred to as a sharing agreement). Petitioner and other defendants signed a sharing agreement that covered the claims of various opt-out plaintiffs, including the claims of opt-out plaintiff Dean Foods Co. (hereinafter Dean Foods), and signed a separate sharing agreement that covered only the claims of opt-out plaintiff Kraft, Inc. (hereinafter Kraft). (The sharing agreement that covered the claims of various opt-out plaintiffs, including Dean Foods, hereinafter is referred to as the general sharing agreement, and the sharing agreement that covered the claims of Kraft hereinafter is referred to as the Kraft sharing agreement.)

One portion of the general sharing agreement divided liability into two parts for a payment to opt-out plaintiffs pursuant to a settlement agreement that "encompasse[d]" folding carton claims. First, general sharing agreement signatories that entered into any such settlement agreement with opt-out plaintiffs would share 95 percent of the payment under such settlement agreement in proportion to each such signatory's sales of folding cartons to the opt-out plaintiffs. Second, 5 percent of the payment would be shared on a per capita basis among sharing agreement signatories that entered into any such settlement agreement with opt-out plaintiffs.[19]

Another part of the general sharing agreement contained provisions that specifically applied to the milk carton claim

---

[17]This renewed motion only related to the claims of the opt-out plaintiffs.

[18]See note 9 *supra.*

[19]Portions of any payment shared on a per capita basis also were subject to certain absolute dollar limitation provisions. Those provisions of the general sharing agreement, however, are not material to our decision.

of Dean Foods.[20] One such provision applied to general sharing agreement signatories that had not sold milk cartons to Dean Foods (hereinafter Dean Foods folding carton signatories). Under that provision, Dean Foods folding carton signatories would be required to make a contribution to each general sharing agreement signatory that sold milk cartons to Dean Foods (hereinafter Dean Foods milk carton signatory) if such Dean Foods milk carton signatory (1) settled a milk carton claim against itself, and (2) in connection therewith, caused Dean Foods to agree not to assert that claim against any general sharing agreement signatory. For petitioner, this contribution would be that part of $10,000 equal to such settling Dean Foods milk carton signatory's percentage of milk carton sales to Dean Foods.[21] That provision only applied, however, if the Dean Foods folding carton signatories had not settled Dean Foods' milk carton claim against them prior to the time the Dean Foods milk carton signatory entered into a settlement agreement meeting the foregoing requirements.

Another provision regarding the milk carton claim of Dean Foods provided, in essence, that if any Dean Foods folding carton signatory (1) entered into a "Settlement" with Dean Foods, and (2) satisfied requirements 2, 3, and 4 of article IV (B) of the general sharing agreement,[22] then that signatory would not be subject to the judgment sharing provisions of the sharing agreement with respect to the milk carton claim of Dean Foods.

Requirements 2, 3, and 4 of article IV (B) of the general sharing agreement were as follows:

ARTICLE IV

SETTLEMENT OF FOLDING CARTON CLAIMS

\*　　\*　　\*　　\*　　\*　　\*　　\*

B. \* \* \*

2. The Signatory or group of Signatories entering into an agreement of Settlement with an Opt Out Claimant(s) refrains from requiring such Opt Out Claimant(s) to reduce or refund any Settlement payment by such

---

[20]These provisions of the general sharing agreement referred specifically to the Dean Foods milk carton claim, and did not refer to any other milk carton claims of opt-out plaintiffs.

[21]Such sales percentages were set forth in an exhibit attached to the general sharing agreement. The total of the sales percentages for all Dean Foods milk carton signatories was 100 percent.

[22]Art. IV governed the settlement of folding carton claims.

Signatory(ies) in the event such Opt Out Claimant(s) settle(s) with another Signatory on a basis different from the Settlement effected with such Signatory(ies); and

3. The Signatories seek to pursue a joint approach to negotiating settlement of each Opt Out Claim, which may include the selection of persons to negotiate with Opt Out Claimants; provided, however, that a Signatory(ies) need not join in or accept any Settlement or proposed Settlement which is the outcome of such joint approach; and provided that any Signatory may at any time after the commencement of such joint Settlement negotiations cease to participate in such joint Settlement negotiations with respect to an Opt Out Claimant(s), if such Signatory gives notice for such decision to all other Signatories which are then defendants to the Claimant's Claim, which notice must be prior to the commencement of any individual Settlement negotiations by such Signatory with such Opt Out Claimant(s); and

4. Upon reaching a Settlement with an Opt Out Claimant(s), a Signatory gives notice of the terms thereof within ten days to all other Signatories which are then defendants to that Claimant's folding carton claim.

The term "Settlement," as used in the foregoing provision and in other parts of the general sharing agreement, was defined by the general sharing agreement as "any disposition of a Claim by agreement with any [opt-out Plaintiff]." The term "Claim," as used in the definition of the term "Settlement" and in other parts of the general sharing agreement, was defined as "any demand in any action listed in Exhibit A hereto, brought by an [opt-out plaintiff] for damages, * * * based upon any alleged violation of the antitrust laws with respect to the purchase or sale at any time of folding cartons and/or milk cartons."[23]

In 1980, Dean Foods accepted $500,000 from all the defendants in settlement of its folding carton claim against such defendants and in settlement of its milk carton claim against the defendants that did not sell milk cartons to Dean Foods. Petitioner's share of the Dean Foods settlement payment was determined under the general sharing agreement provisions that governed payments under settlement agreements that encompassed folding carton claims, and such determination took into account the percentage of folding cartons that Dean Foods purchased from petitioner—Dean Foods purchased 11.85 percent of its folding

---

[23]Exhibit A to the general sharing agreement listed the various legal actions brought by the opt-out plaintiffs. Included in the list was the action brought by Dean Foods.

cartons from petitioner during the period in which the alleged antitrust activities occurred. The amount of petitioner's share was $57,374,[24] and petitioner paid that amount.

Dean Foods' aggregate purchases of milk cartons from settling defendants amounted to approximately $70 million for the relevant period, and its aggregate purchases of folding cartons from settling defendants amounted to approximately $7 million for the same period.

For tax purposes, petitioner based its allocation of its share of the settlement payment on the aggregate sales of the group of settling defendants to Dean Foods: petitioner allocated 90.9 percent of its $57,374 settlement payment, or $52,152.97, to the Dean Foods milk carton claim and the remainder of the settlement payment, or $5,221.03, to the Dean Foods folding carton claim.

The Kraft sharing agreement contained provisions similar to the provisions contained in the general sharing agreement. The Kraft sharing agreement provided that sharing agreement signatories that had not sold milk cartons to Kraft (hereinafter Kraft folding carton signatories) would make a contribution to each Kraft sharing agreement signatory that had sold milk cartons to Kraft (hereinafter Kraft milk carton signatory) if the Kraft milk carton signatory (1) settled Kraft's milk carton claim against that Kraft milk carton signatory, and (2) in connection therewith, caused Kraft to agree not to assert a claim against any Kraft sharing agreement signatory based on sales of milk cartons by the settling Kraft milk carton signatory to Kraft. For petitioner, this contribution would be that part of $10,000 equal to each such settling Kraft milk carton signatory's percentage of milk carton sales to Kraft.[25]

Several defendants that were Kraft milk carton signatories settled with Kraft. Each such defendant signed a separate settlement agreement that settled the milk carton

---

[24]A. Petitioner's share of the settlement payment was calculated as follows pursuant to the general sharing agreement provision that focused on each defendant's actual sales: .1185 × .95 × $500,000 = $56,287.

B. Petitioner's share of the settlement payment was $1,087 under the sharing agreement provision that focused on each defendant's per capita share.

C. Petitioner's total share of the settlement payment to Dean Foods therefore was $57,374 ($56,287 + $1,087).

[25]Such sales percentages were set forth in an exhibit attached to the Kraft sharing agreement. The total of the sales percentages for all Kraft milk carton signatories was 100 percent.

claim against such settling defendant, and in connection with each such agreement, Kraft agreed not to assert a claim against any Kraft sharing agreement signatory based on sales of milk cartons by the settling defendant to Kraft. Pursuant to the foregoing Kraft sharing agreement provision regarding Kraft's milk carton claim, petitioner contributed $4,778.90 to amounts paid by the settling Kraft milk carton signatories.

The total value of petitioner's settlement payments with respect to claims by all opt-out plaintiffs, including Dean Foods and Kraft, was $178,569.14. Of this amount, $17,822 represented a payment of legal fees.[26] Dean Foods and Kraft were the only opt-out plaintiffs that asserted milk carton claims.

## OPINION

The issue for decision is whether section 162(g) disallows a deduction for two-thirds of all amounts paid by petitioner[27] to settle antitrust actions brought under section 4 of the Clayton Act.[28]

Section 162(a) provides that a deduction shall be allowed for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Nevertheless, section 162(g) disallows a deduction under section 162(a) for two-thirds of certain amounts paid with respect to an action brought under section 4 of the Clayton Act.[29] Section 162(g), provides, in pertinent part, as follows:

SEC. 162(g). TREBLE DAMAGE PAYMENTS UNDER THE ANTITRUST LAWS.—If in a criminal proceeding a taxpayer is convicted of a violation of the antitrust laws, or his plea of guilty or nolo contendere to an indictment or information charging such violation is entered or accepted

---

[26]The parties have stipulated to this allocation.

[27]As to the amounts paid by petitioner under the settlement agreements discussed herein, the parties to this case agree on the portion of such amounts that are allocable to various legal fees to which sec. 162(g) does not apply. See sec. 1.162-22(a)(2), Income Tax Regs. Thus,

[28]Sec. 4 of the Clayton Act, 15 U.S.C. sec. 15 (1976), provides, in pertinent part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[29]For a more extensive discussion of sec. 162(g) and its genesis, see Wilberding, "New Tax Considerations Injected into Antitrust Damage Proceedings," 19 Kan. L. Rev. 441 (1971).

in such a proceeding, no deduction shall be allowed under subsection (a) for two-thirds of any amount paid or incurred—

* * * * * * *

(2) in settlement of any action brought under * * * section 4 [of the Clayton Act] on account of such violation or related violation.

The statutory requirement that the antitrust violation involved in a civil proceeding be the same as, or related to, the violation involved in a criminal proceeding gives effect to the desire of Congress to deny a deduction "only in the case of 'hard-core violations' where intent has been clearly proved in a criminal proceeding." S. Rept. 91-552 (1969), 1969-3 C.B. 423, 597.

In the instant case, petitioner pleaded nolo contendere to charges in an indictment. That indictment charged petitioner and other defendants with a violation of the antitrust laws involving only folding cartons, not milk cartons. In the civil antitrust litigation instituted by purchasers of cartons,[30] however, there were allegations by plaintiffs that the prices of *both* milk cartons and folding cartons were affected by a single conspiracy, and that such conspiracy violated the antitrust laws. Thus, the violation giving rise to the criminal action is not the same in all material respects as the violation giving rise to the civil antitrust actions. We therefore must allocate settlement payments between the milk carton claims and the folding carton claims.[31]

Payments in settlement of litigation are characterized for tax purposes by reference to the origin and nature of the claim that was the actual basis for settlement (*United States v. Gilmore,* 372 U.S. 39 (1963); *Bent v. Commissioner,* 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987)), and not by reference to the validity of that claim

the amounts allocable to legal fees are not in issue, and references in our analysis to petitioner's payments do not include such amounts.

[30]References to any type of civil antitrust litigation hereinafter are to the litigation instituted by purchasers of cartons, and not to the civil enforcement action brought by the Government.

[31]Respondent does not allege that the milk carton claims in the civil litigation are "related" to the violation involved in the criminal case. We therefore do not address that issue. The statutory term "related violation" is defined in sec. 1.162-22(c), Income Tax Regs. See also sec. 1.162-22(f), examples *(2)* and *(3),* Income Tax Regs.; *Fisher Cos., Inc. v. Commissioner,* 84 T.C. 1319, 1338-1343 (1985), affd. without published opinion 806 F.2d 263 (9th Cir. 1986).

(*Bent v. Commissioner,* supra at 244).[32] A determination as to how to allocate settlement payments is factual (*Knuckles v. Commissioner,* 349 F.2d 610, 612 (10th Cir. 1965), affg. a Memorandum Opinion of this Court; *Seay v. Commissioner,* 58 T.C. 32, 37 (1972)), and petitioner bears the burden of proving that respondent's allocation is erroneous (*Fisher Cos. v. Commissioner,* 84 T.C. 1319, 1339 (1985), affd. without published opinion 806 F.2d 263 (9th Cir. 1986); *Bresler v. Commissioner,* 65 T.C. 182, 188 (1975); Rule 142(a)). Such determination requires consideration of all the facts, including the issues stated, the defenses asserted, the background of the litigation, and other facts pertinent to the controversy giving rise to the settlement. See *Morgan's Estate v. Commissioner,* 332 F.2d 144, 151 (5th Cir. 1964); *Rafter v. Commissioner,* 60 T.C. 1, 8 (1973), affd. without published opinion 489 F.2d 752 (2d Cir. 1974); *Boagni v. Commissioner,* 59 T.C. 708, 713 (1973). When an allocation of settlement payments must be made and there is no express allocation contained in a settlement agreement, the most important fact for purposes of making the allocation is "the intent of the payor."[33] *Knuckles v. Commissioner,* 349 F.2d at 613; see also *Bent v. Commissioner,* supra at 244, and cases cited therein.

Respondent's principal argument is that all of petitioner's settlement payments are allocable to folding carton claims, and that because the folding carton claims were the subject of a criminal action in which petitioner pleaded nolo contendere, section 162(g) applies to all of petitioner's settlement payments. Respondent bases that argument on the following grounds: (1) Petitioner did not manufacture milk cartons; (2) there has been no showing that petitioner "was in fact jointly and severally liable for" milk carton claims; (3) section 162(g) was intended to apply "in the case of 'hard core' violations where intent has been clearly proved in a criminal proceeding"; and (4) certain defendants signed sharing agreements which, in large part, based each such defendant's liability on the defendant's actual sales.

---

[32]For purposes of this test, the "claim" in the instant case is the alleged conspiracy, not the milk carton claims and folding carton claims. See note 8 *supra* concerning our use of the terms "milk carton claims" and "folding carton claims."

[33]It should also be noted, however, that this Court will not give effect to a settlement agreement or similar document written solely to enable a taxpayer to claim a deduction. See

Respondent alternatively argues that only a nominal portion of petitioner's settlement payments should be allocated to milk carton claims. Respondent bases his alternative argument on essentially the same grounds relied upon by respondent in support of his principal argument.

Petitioner argues that it is entitled to allocate to the milk carton claims more than a nominal portion of each of its payments that were made in settlement of the civil antitrust actions, and that amounts so allocated are fully deductible. Petitioner further argues that the allocation should be based on the aggregate sales of all settling defendants to the relevant plaintiffs.[34] Petitioner bases his arguments on the attempt by the plaintiffs in the civil antitrust litigation to hold petitioner jointly and severally liable for all damages allegedly caused by the carton manufacturers implicated in that antitrust litigation.

In light of the factual nature of the issue in this case, we separately analyze the various settlement arrangements pursuant to which petitioner made payments.

### Settlement of Class Action

It is well established that the principle of joint and several liability applies to antitrust conspirators. *MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580, 584-585 (5th Cir. 1985); *City of Atlanta v. Chattanooga Foundry & Pipeworks*, 127 F. 23 (6th Cir. 1903), affd. 203 U.S. 390 (1906). Moreover, there is no right to contribution among antitrust conspirators. *Texas Industries v. Radcliffe Materials, Inc.*, 451 U.S. 630 (1981).[35]

Although many complaints were filed by purchasers of folding cartons, milk cartons, or both types of cartons, those complaints alleged that there was only a single antitrust conspiracy, and at least some of the complaints

---

*Metzger v. Commissioner*, 88 T.C. 834, 849-850 (1987); *Fisher Cos., Inc. v. Commissioner, supra* at 1340.

[34]For instance, since 23.6 percent of the aggregate sales of cartons by all settling defendants to the settling plaintiffs constituted sales of milk cartons, petitioner argues that it should be able to allocate 23.6 percent of its settlement payments to milk carton claims.

[35]Petitioner made payments in settlement of the class action and the opt-out plaintiffs' cases prior to the Supreme Court's decision in *Texas Industries v. Radcliffe Materials, Inc.*, 451 U.S. 630 (1981). Nevertheless, prior to *Texas Industries*, as well as prior to the time the settlement arrangements discussed herein were entered into by the parties, the legal authority that existed on the issue of contribution among antitrust conspirators indicated that there was no such right. See generally 47 A.L.R. Fed. 712 (1980).

alleged that the conspiracy involved both folding cartons and milk cartons. Moreover, Edward Wolfe, the attorney who represented petitioner for purposes of the antitrust litigation, testified that even the plaintiffs that used only the term "folding cartons" in their complaints "asserted in the course of the proceedings that they were covering milk cartons as well." We found Mr. Wolfe to be a particularly credible witness, and respondent did not offer any evidence that caused us to doubt Mr. Wolfe's testimony.

During the course of the class action, the District Court judge that presided over the civil antitrust litigation certified the class of plaintiffs as "purchasers of folding cartons," but he made clear several times that he considered the term "folding carton" to include milk cartons for purposes of that litigation. The presiding judge made that point clear in response to motions filed by several defendants, not including petitioner, to sever claims involving milk cartons from the litigation. After reviewing the briefs and documents submitted by the parties, the judge stated, "There doesn't appear to be any such significant difference so that the milk carton industry could be called a separate industry from the folding carton industry." Subsequently, in response to a motion to reconsider his earlier denial of such defendants' motion, the judge once again refused to sever milk carton claims from the litigation.

Based upon the foregoing law and evidence, we find that the settling plaintiffs sought to hold petitioner jointly and severally liable for all damages alleged to have flowed from an antitrust conspiracy, regardless whether those damages were related to the conspiracy's alleged effects on prices of folding cartons or milk cartons.

Attempts to sever milk carton claims from the litigation, and thereby possibly defeat the attempt by the plaintiffs to hold all the defendants jointly and severally liable with respect to milk carton claims and folding carton claims, proved unsuccessful. Thus, petitioner was placed in a position where it naturally would be concerned about liability for both milk carton claims and folding carton claims, even though it did not manufacture milk cartons.

The parties to the class action made various attempts to settle such action. In 1977, a group of defendants, including

petitioner, made a settlement proposal to the plaintiffs in the class action. The proposal provided that each defendant would settle claims made by its own customers, and would make settlement payments to those customers. The proposal also required the plaintiffs to exclude the sales of settling defendants from legal actions maintained against any defendants that refused to settle. Thus, the settlement proposal indicates that the defendants had grouped together in an effort to protect each other from claims that attempted to hold nonsettling defendants jointly and severally liable for the acts of the settling defendants. The plaintiffs ultimately rejected such proposal. Nevertheless, the proposal provides further evidence of the defendants' concern about joint and several liability for both milk carton claims and folding carton claims.

Subsequently, petitioner settled with certain plaintiffs in the class action (i.e., the settling plaintiffs), and the settlement agreement covered both milk carton claims and folding carton claims. The settlement agreement did not contain an explicit allocation of amounts paid under the agreement. Nevertheless, all the evidence in the instant case suggests that petitioner, the payor, intended that its payments under the settlement agreement with the settling plaintiffs would settle *both* milk carton claims and folding carton claims, and we so find.

As noted, respondent's principal argument in this case is that all of petitioner's settlement payments are allocable to folding carton claims, and respondent's alternative argument is that only a nominal portion of petitioner's settlement payments is allocable to milk carton claims. As bases for both of those arguments, respondent relies upon essentially the same grounds.

Respondent first relies upon the nature of petitioner's business: petitioner did not manufacture or sell milk cartons. According to respondent, since petitioner did not manufacture milk cartons, and the milk carton and folding carton industries are separate, the origin of petitioner's liability was petitioner's antitrust activities with respect to folding cartons, not milk cartons. That argument, however, ignores the claims of the settling plaintiffs—they attempted to hold petitioner, as well as the other defendants, jointly

and severally liable for *all* damages flowing from the alleged conspiracy. Thus, the settling plaintiffs were alleging that any activities in which petitioner engaged that were in violation of the Federal antitrust laws affected the prices of *both* milk cartons and folding cartons. The nature of petitioner's business therefore is not a valid predicate for respondent's arguments concerning the allocation of petitioner's settlement payments.

Respondent next relies upon petitioner's failure to prove that it "was in fact jointly and severally liable for" milk carton claims. That argument, however, ignores the well settled principle of law that courts must focus on the origin and nature of a claim, and not on the validity of the claim in characterizing the payments for tax purposes. See *Bent v. Commissioner,* 87 T.C. at 244. We therefore hold that petitioner is not required to prove joint and several liability, in fact, in order to prove that it is entitled to allocate a portion of its settlement payments to milk carton claims.

Respondent next points to the legislative purpose for section 162(g), which, as already noted, was to deny a deduction only "in the case of 'hard core violations' where intent has been clearly proved in a criminal proceeding." S. Rept. 91-552 (1969), 1969-3 C.B. 423, 597. According to respondent, petitioner's proposed allocation method, which focuses on the aggregate sales of all the settling antitrust defendants to the settling plaintiffs, creates the potential for inequities with respect to any defendant in the class action that sold folding cartons and milk cartons, but had milk carton sales in excess of the aggregate milk carton sales of all the antitrust defendants. Respondent's argument, however, ignores the legal principles governing the liability of antitrust conspirators (i.e., those conspirators are jointly and severally liable for all damages, and have no right to contribution). If the District Court did not sever milk carton claims from the class action, and the class action were tried and decided against all defendants, application of those legal principles would not have resulted in a difference between the relative liability of the defendants in the antitrust case based upon whether the defen-

dants sold milk cartons or folding cartons.[36]

Last, respondent relies upon the sharing agreements to establish that all parties to the antitrust litigation "gave a low valuation to the risk of joint and several liability." Respondent apparently makes this point in connection with the legal principle that when there is no settlement payment allocation contained in a settlement agreement, the most important factor to be considered is the intent of the payor. See *Knuckles v. Commissioner,* 349 F.2d at 613; *Bent v. Commissioner,* 87 T.C. at 244. Nevertheless, the sharing agreements to which respondent refers were not applicable to the settlement agreement between petitioner and the settling plaintiffs. Moreover, the evidence in the instant case indicates that the defendants entered into the sharing agreements subsequent to petitioner's settlement with the settling plaintiffs. We therefore do not find the sharing agreements to be persuasive evidence that petitioner intended an allocation with respect to its settlement agreement with the settling plaintiffs based upon its actual sales to those plaintiffs.

Based upon the foregoing and the record as a whole, we find that it was the intent of petitioner to allocate settlement payments to milk carton claims and folding carton claims based upon the aggregate sales of all settling defendants in the class action to the settling plaintiffs. Moreover, we hold that petitioner's allocation of settlement payments with respect to its settlement agreement with the settling plaintiffs is proper because it reflects our finding with respect to petitioner's intent. Accordingly, section 162(g) does not apply to the portion of petitioner's settlement payments that is allocable to the milk carton claims of the settling plaintiffs (i.e., 23.6 percent of petitioner's payments).

### Settlements With Opt-Out Plaintiffs

Thus far, we have determined how payments made by petitioner to settle the class action are to be allocated. Our allocation was based upon the aggregate sales of all settling

---

[36]Respondent has not brought any evidence to our attention concerning any distinction that would have been made in the class action based upon the actual sales of each of the defendants in that action.

defendants in the class action to the settling plaintiffs. We made such allocation because of various legal principles governing liability in antitrust actions (i.e., defendants in such actions are jointly and severally liable and unable to seek contribution from other defendants or potential defendants) and other facts relating to the antitrust litigation.

The circumstances surrounding settlement payments made by petitioner to settle the claims of opt-out plaintiffs, however, are distinguishable from the circumstances surrounding settlement payments made by petitioner to settle the class action; sharing agreements (i.e., agreements among the defendants as to how they would share liability) were entered into by most of the defendants with respect to the claims of the opt-out plaintiffs, but not with respect to the claims of the settling plaintiffs. Petitioner has provided us with relatively detailed evidence of the circumstances surrounding its share of settlement payments that were made to Dean Foods and Kraft pursuant to sharing agreements. We therefore first analyze petitioner's ability to deduct its share of those payments.

In 1980, Dean Foods accepted $500,000 from all the defendants in settlement of its folding carton claim against such defendants and in settlement of its milk carton claim against the defendants that did not sell milk cartons to Dean Foods. Petitioner's share of the Dean Foods settlement payment was $57,374, and was determined under the provisions of the general sharing agreement that governed liability for a payment made pursuant to a settlement agreement that encompassed folding carton claims. Under one of those folding carton claim provisions, general sharing agreement signatories that entered into the settlement agreement with Dean Foods shared 95 percent of the payment made pursuant to that settlement agreement in proportion to each such signatory's sales of folding cartons to Dean Foods (this provision hereinafter is referred to as the 95-percent provision). Under another such folding carton claim provision, general agreement signatories that entered into a settlement agreement with Dean Foods also shared on a per capita basis 5 percent of the payment under that settlement agreement, subject to certain limitations (this

provision hereinafter is referred to as the 5-percent provision).

As we have noted, the principle of joint and several liability applies to antitrust conspirators, and antitrust conspirators cannot seek contribution from their co-conspirators. Nevertheless, the general sharing agreement provided to those defendants that were parties to such agreement protection against the potentially far-reaching effects of the foregoing legal principles; this was done by basing the relative liability of each such defendant primarily on the actual sales of each such defendant.[37] The 95-percent provision is one provision in the general sharing agreement that had such an effect. Due to the effect of the 95-percent provision on petitioner's economic, or nontax, liability for amounts payable under the settlement agreement with Dean Foods, we find that such provision is the best evidence of petitioner's intent with regard to allocations of amounts paid pursuant to that provision. We therefore hold that petitioner must allocate solely to the Dean Foods folding carton claim petitioner's share of the defendants' settlement payment to Dean Foods that was determined under the 95-percent provision (i.e., petitioner's settlement payment that was based upon petitioner's actual sales of folding cartons).

We next address the amount paid by petitioner pursuant to the 5-percent provision of the general sharing agreement. Such amount was based upon petitioner's per capita share of 5 percent of the total amount paid under the settlement with Dean Foods, and not upon petitioner's actual sales to Dean Foods.

The 5-percent provision was one of the provisions of the general sharing agreement that governed liability for a payment made pursuant to a settlement agreement that encompassed *folding carton claims.* Petitioner has not argued why the 5-percent provision should be interpreted so as to indicate that petitioner intended to allocate to the Dean Foods milk carton claim petitioner's payment pursu-

---

[37]Petitioner contends that the sharing agreements "could not affect in any way the legal liability of a defendant to the Opt-Out Plaintiffs on the underlying claims." Nevertheless, the sharing agreements did give the defendants the ability to affect the ultimate net liability of each defendant to the opt-out plaintiffs—the effect of the general sharing agreement was to avoid the noncontribution principles that otherwise apply to antitrust conspirators.

ant to the 5-percent provision.[38] Therefore, bearing in mind petitioner's burden of proof in this case, we find that petitioner intended to allocate such amount to the Dean Foods folding carton claim. See Rule 142(a). We therefore hold that petitioner must allocate solely to the Dean Foods folding carton claim petitioner's share of the defendant's settlement payment to Dean Foods that was determined under the 5-percent provision of the general sharing agreement (i.e., petitioner's payment that was based upon petitioner's per capita share of the defendants' payment).

Based upon the foregoing, all of petitioner's payment with regard to the Dean Foods settlement is allocable to the Dean Foods folding carton claim, and section 162(g) applies to that amount.

We next address petitioner's share of settlement payments made to Kraft. Several defendants that were Kraft Milk Carton Signatories settled with Kraft. Each such defendant signed a separate settlement agreement that settled the milk carton claim against such settling defendant, and in connection with each such agreement, Kraft agreed not to assert a claim against any Kraft sharing agreement signatory based on sales of milk cartons by the settling defendant to Kraft.

Pursuant to one of the Kraft sharing agreement provisions governing Kraft's milk carton claims against Kraft milk carton signatories, petitioner paid a total of $4,778.90 to the Kraft milk carton signatories. That provision provided that petitioner, as well as other Kraft folding carton signatories, was required to pay amounts to Kraft milk carton signatories that (1) settled the Kraft milk carton claim against such Kraft milk carton signatories, and (2) in connection therewith, caused Kraft to agree not to assert that same claim against any sharing agreement signatory.[39] Since petitioner's payments with respect to the Kraft settlement agreements were made pursuant to the foregoing milk carton claim provision, it is apparent that petitioner intended that such amounts be allocated specifically to the

[38]Petitioner did argue, however, that we should not base allocations upon the provisions of the sharing agreements, and we rejected such argument. See note 37 *supra.*

[39]A milk carton claim against any Kraft milk carton signatory could be asserted against any defendant based upon the principle of joint and several liability, absent an agreement precluding Kraft from asserting such claim against other defendants in the antitrust litigation.

Kraft milk carton claim, and we so find. We therefore hold that such amounts are allocable to the Kraft milk carton claim, and that section 162(g) does not apply to those amounts.

Finally, there remains in issue that portion of petitioner's $160,747.14 settlement payment with respect to the claims of opt-out plaintiffs other than Dean Foods or Kraft.[40] The terms of the general sharing agreement and the Kraft sharing agreement indicate that the general sharing agreement governed settlement payments made by the defendants to all opt-out plaintiffs other than Kraft. The provisions of the general sharing agreement that governed payments to settle a milk carton claim refer only to the Dean Foods milk carton claim. Therefore, with respect to the legal actions of the remaining opt-out plaintiffs, petitioner has not proved that there are any milk carton claims to which its settlement payment can be allocated. Moreover, even if there were such milk carton claims, there is no evidence in the record that persuades us that it would be proper to treat the payments to those opt-out plaintiffs differently than we treated petitioner's payment with regard to the Dean Foods settlement. Bearing in mind petitioner's burden of proof in this case, we allocate the remaining amount to folding carton claims, and section 162(g) applies to that amount. See Rule 142(a)

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[40]The $160,747.14 settlement payment represents the total value of petitioner's settlement with the opt-out plaintiffs, which was $178,569.14, minus legal fees, which were $17,822.