MCDERMOTT INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 39999–86.                    Filed July 29, 1993.

*John P. Carroll, Jr.,* and *Leslie Hoffman Altus,* for petitioner.

*Thomas R. Ascher,* for respondent.

OPINION

NIMS, *Judge:* This matter is before the Court on petitioner's motion for partial summary judgment and respondent's cross-motion for partial summary judgment, both under Rule 121. (All Rule references are to the Tax Court Rules of Practice and Procedure. Except where otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the relevant years involved in this case.) The parties agree that, with one minor objection by respond-

ent, there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Respondent's only objection is to the relevancy of certain matters stated in the affidavit of Michael P. Tierney which is part of the material submitted by petitioners. As discussed *infra,* such matters are held relevant but not determinative of the issue.

The issue for decision is the extent, if any, to which payments made by petitioner to various plaintiffs in settlement of a consolidated Clayton Act treble damage case were "on account of" petitioner's admitted violation of the Sherman Act, within the meaning of section 162(g).[1]

## Background

Petitioner's principal place of business when it filed its petition and at all other relevant times was located in New Orleans, Louisiana. During the taxable years ended March 31, 1983, through March 31, 1986, petitioner was the common parent of a group of affiliated corporations filing consolidated Federal income tax returns.

During the above years, petitioner engaged in the marine construction business, which included building and installing undersea pipelines and offshore drilling and production platforms used to produce crude oil and natural gas from undersea reservoirs.

In 1977, the Antitrust Division of the U.S. Department of Justice began an investigation of alleged collusive bidding and other anticompetitive practices by certain persons and firms engaged in the business of marine construction. Petitioner, its competitor Brown & Root, Inc. (B&R), and certain officers of each were targets of the investigation. Documents relating to marine construction work performed by petitioner and B&R were collected during this investigation. These documents were ultimately lodged in a "Depository" under court supervision for the benefit of future Clayton Act plaintiffs.

On December 13, 1978, petitioner and the Antitrust Division entered into a plea agreement in which it was agreed

---

[1] The full citations for these landmark statutory provisions are:

Sherman Antitrust Act, ch. 247, 26 Stat. 209 (1890). Clayton Act, ch. 323, 38 Stat. 730, 731 (1914).

that, should a grand jury then considering the case return an indictment against petitioner for a single count violation of section 1 of the Sherman Act, petitioner would enter a plea of nolo contendere to which the United States would acquiesce. Petitioner also agreed that, with certain limitations, it would not oppose a motion to permit disclosure of grand jury materials to any party to a civil action against it. Petitioner and the Antitrust Division also agreed that a fine of $1 million, the maximum penalty for a corporation charged with a violation of section 1 of the Sherman Act, would be appropriate.

The grand jury returned an indictment on the following day, December 14, 1978, naming petitioner, B&R, and six of their officers (the individual defendants) as defendants. The "Offense Charged" in count 1 of the indictment was as follows:

*Offense Charged*

21. Beginning at least as early as January 1960, and continuing thereafter until approximately January 1976, the exact dates being unknown to the Grand Jury, the defendants and co-conspirators engaged in a combination and conspiracy to suppress and eliminate competition in marine construction in unreasonable restraint of the aforesaid interstate and foreign trade and commerce of the United States, in violation of Section 1 of the Sherman Act, Title 15, United States Code, Section 1.

22. The aforesaid combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which were:

(a) to allocate among themselves marine construction projects in the Gulf of Mexico and in other geographic areas;

(b) to submit collusive, non-competitive and rigged bids on marine construction projects in the Gulf of Mexico and in other geographic areas; and

(c) to standardize various terms and conditions under which the defendants were willing to offer their marine construction services.

23. For the purpose of forming and effectuating the aforesaid conspiracy, the defendants and their co-conspirators have done those things which they combined and conspired to do, including among other things:

(a) discussing prospective marine construction projects and the submission of prospective bids therefor;

(b) selecting the marine construction projects put out for competitive bids which they would and did make subject to the aforesaid conspiracy;

(c) designating the low bidder on marine construction projects made subject to the aforesaid conspiracy;

(d) exchanging information concerning bid amounts or bid ranges on marine construction projects made subject to the aforesaid conspiracy;

(e) submitting intentionally high, or complementary, bids on marine construction projects on which one of the defendants or co-conspirators had been designated as the low bidder; and

(f) submitting bids on marine construction projects containing false, fictitious, and fraudulent statements and entries.

Petitioner and B&R entered pleas of nolo contendere in the District Court on the day the indictment was returned, and the District Court judge signed a judgment order, also on the same day, imposing the maximum $1 million fine and directing that it be paid within 10 days. The judgment was entered on December 18, 1978, 4 days later.

On February 12 and 13, 1979, various individual defendants moved the District Court to require the United States to file a bill of particulars specifying the details of the crimes with which such defendants were charged. On March 14, 1979, the Antitrust Division responded with a "Voluntary Bill of Particulars" (bill of particulars) enumerating certain projects covered by contracts alleged to have been bid upon collusively (targeted bid contracts). In the introduction to the bill of particulars the Government reserved the right to file further and amended particulars prior to trial. By June 7, 1979, all individual defendants had entered pleas of nolo contendere and had been sentenced by the District Court. There was never any trial, and there were no further and amended particulars.

The United States did not seek an injunction in connection with any of the proceedings.

After the indictment was returned, and before any of the nolo contendere pleas by the individual defendants were entered, one of the individual defendants filed a motion to seal the bill of particulars. At least three plaintiffs in the Clayton Act litigation (see *infra*) as well as the Antitrust Division filed motions in opposition to the motion to seal. In general, the plaintiffs argued that to seal the bill of particulars would undermine and frustrate the underlying policy of the antitrust laws of the United States, and would be offensive to the public's right to know of the proceedings in antitrust cases. Furthermore, it was argued that Congress intended to minimize the burden of litigation for injured private suitors by making available all matters previously established by the Government in antitrust actions.

In opposing the motion to seal, the Government explained that

Disclosure of the list of marine construction jobs allegedly rigged will * * * simply serve to define the conspiracy alleged in the indictment, which is already public. This too will limit the general allegations of the indictment, and will show that not all of the business of these two companies was allegedly rigged. Thus, the public may discern that the conspiracy was not as pervasive as a reading of the indictment might indicate.

After the indictment was returned, more than 60 companies began suits against petitioner and B&R under section 4 of the Clayton Act. The District Court consolidated these cases into a single action entitled "Marine Construction Antitrust Litigation" (the Clayton Act case). (Section 4 of the Clayton Act provides in pertinent part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained").

Some of the claims in the Clayton Act case related to targeted bid contracts, while others related to contracts which, although awarded on bids, had not been enumerated in the bill of particulars (nontargeted bid contracts) or to negotiated contracts that had not been awarded on bids but had been arrived at through negotiation (negotiated contracts).

Petitioner and B&R entered into an agreement with each plaintiff that had made a claim against petitioner or had made claims against both petitioner and B&R in the Clayton Act case. All claims made by all plaintiffs were released in consideration of the payments provided in the agreements. Each agreement prescribed an amount to be paid by petitioner (or an amount to be paid by petitioner and an amount to be paid by B&R) to a plaintiff. The first agreement was executed during petitioner's taxable year ended March 31, 1983, and the last was executed during petitioner's taxable year ended March 31, 1986. All amounts due from it under the agreements were paid by petitioner during its taxable years ended March 31, 1983, through March 31, 1986.

Fourteen plaintiffs in the Clayton Act case were regulated by the Federal Energy Regulatory Commission (FERC) (regulated plaintiffs). None of the other Clayton Act plaintiffs were regulated by the FERC (unregulated plaintiffs).

Pursuant to the agreements, petitioner paid plaintiffs the following total sums in settlement of all claims against petitioner by all of the plaintiffs:

| | |
|---|---|
| Unregulated plaintiffs | $80,959,034 |
| Regulated plaintiffs | 13,000,000 |
| Total settlement | 93,959,034 |

One of the suits filed in the Clayton Act case was filed by Marathon Oil Co. (Marathon), an unregulated plaintiff. On December 23, 1982, petitioner and B&R jointly entered into an agreement with Marathon (the Marathon agreement). After the execution of the Marathon agreement, petitioner (or petitioner and B&R jointly) entered into the agreements referred to above with each of the other unregulated plaintiffs.

As previously described, petitioner's marine construction business was performed under both competitive bid contracts and negotiated contracts. Petitioner performed work for Marathon under a large number of both types of contracts. Since work was performed for Marathon in all of the various Clayton Act case contexts, the basis for settling the multiple Marathon claims against petitioner and B&R (the Marathon formula) served as a paradigm for settling all of the Clayton Act cases.

All marine construction contracts between the unregulated plaintiffs and either or both of the corporate defendants in the Clayton Act case were divided into the following categories (groups) for the purpose of stating and applying the Marathon formula:

GROUP A: Contracts in connection with the marine construction projects referred to in the bill of particulars.

GROUP B: Contracts other than those within Group A or Group C divided into subsidiary Groups as follows:

Group B(1)(a): Bid Contracts executed from December 14, 1974 to December 31, 1975, inclusive, for work within the United States.

Group B(1)(b): Negotiated Contracts executed from December 14, 1974 to December 31, 1975, inclusive, for work within the United States.

Group B(1)(c): Bid Contracts executed from December 14, 1974 to December 31, 1975, inclusive, for work outside the United States.

Group B(1)(d): Negotiated Contracts executed from December 14, 1974 to December 31, 1975, inclusive, for work outside the United States.

Group B(2)(a): Bid Contracts executed from January 1, 1970 to December 13, 1974, inclusive, or during the year 1976 for work within the United States.

Group B(2)(b): Negotiated Contracts executed from January 1, 1970 to December 13, 1974, inclusive, or during the year 1976 for work within the United States.

Group B(2)(c): Bid Contracts executed from January 1, 1970 to December 13, 1974, inclusive, or during the year 1976 for work outside the United States.

Group B(2)(d): Negotiated Contracts executed from January 1, 1970 to December 13, 1974, inclusive, or during the year 1976, for work outside the United States.

Group B(3)(a): Bid Contracts executed before 1970 or during 1977, for work within the United States.

Group B(3)(b): Negotiated Contracts executed before 1970 or during 1977, for work within the United States.

Group B(3)(c): Bid Contracts executed before 1970 or during 1977, for work outside the United States.

Group B(3)(d): Negotiated Contracts executed before 1970 or during 1977 for work outside the United States.

GROUP C: Contracts with respect to a marine construction project in connection with which McDermott received less than $100,000.00 in total.

All contracts between petitioner and the unregulated plaintiffs that fell within Group A were bid contracts.

The Marathon formula assigned to each group a numerical value (settlement factor) as follows:

| Group | Settlement factor |
|---|---|
| A | .07500 |
| B(1)(a) | .02000 |
| B(1)(b) | .01000 |
| B(1)(c) | .01000 |
| B(1)(d) | .00500 |
| B(2)(a) | .01000 |
| B(2)(b) | .00500 |
| B(2)(c) | .00500 |
| B(2)(d) | .00250 |
| B(3)(a) | .00500 |
| B(3)(b) | .00250 |
| B(3)(c) | .00250 |
| B(3)(d) | .00125 |
| C | -0- |

The amount to be paid by petitioner to an unregulated plaintiff in settlement of all claims against petitioner made by the unregulated plaintiff in the Clayton Act case was determined under the Marathon formula as follows:

(a) The full amount paid to McDermott and Affiliates pursuant to each Group of contracts by or on behalf of that unregulated plaintiff was determined.

(b) The amount determined pursuant to (a) above with respect to each Group of contracts was multiplied by the Settlement Factor related to that Group of contracts.

(c) The amounts determined pursuant to (b) above were added to determine the total amount to be paid to the unregulated plaintiff in question.

Petitioner and B&R negotiated a lump-sum settlement with the regulated plaintiffs in the total amount of $24,046,937. Of this amount, petitioner paid $13 million. The "Agreement in Settlement of Claims and Litigation" (regulated plaintiffs agreement), entered into in counterparts by petitioner, B&R, and each of the regulated plaintiffs, recites that the parties are settling:

all possible claims of each Plaintiff (whether actual, alleged, or allowed by law to be alleged, and whether or not in fact alleged in the above-mentioned litigation) for any relief, including but not limited to punitive damages and attorneys fees, from either Defendant by reason of the latter's participation in any conspiracy or conspiracies in restraint of trade (or by reason of any other cause of action or claim arising out of or related to the same or similar conduct of defendants) affecting work done for any Plaintiff, its predecessors or successors relating to offshore marine facilities, construction, or associated services from the beginning of time to the date of this Agreement.

The basis upon which the lump-sum settlement was to be apportioned among the respective regulated plaintiffs is not stated in the regulated plaintiffs' agreement, although an annex thereto itemizes the payments to each to be made by petitioner and B&R, respectively. The settlement was contingent upon each regulated plaintiff's obtaining a final and nonappealable order from the FERC that the proposed settlement was proper. Since petitioner's settlement payments were eventually made, such FERC orders were presumably obtained.

Petitioner has submitted an affidavit by Michael P. Tierney, one of petitioner's counsel in the Clayton Act case, in which he states, among other things, that he advocated use of the Marathon formula because the charge leveled under the Sherman Act was a conspiracy to restrain trade in marine construction "by submitting collusive bids * * * in the course of the marine construction projects identified in the Bill." Petitioner recognized that plaintiffs in the Clayton

Act case had access to the documents gathered by the Antitrust Division and lodged in the Depository and that such documents could be used to support claims in respect of targeted bid contracts. Accordingly, petitioner was willing to pay 7.5 percent of contract revenue to settle claims in respect of targeted bid contracts. Petitioner's counsel further states that he maintained, in dealing with counsel for plaintiffs in the Clayton Act case, that claims relating to negotiated contracts and nontargeted bid contracts were "fundamentally different" from claims relating to targeted bid contracts and that documents gathered by the Antitrust Division would not provide any significant evidence with respect to such claims. Thus, he maintained in the negotiations that to pursue claims relating to negotiated contracts or nontargeted bid contracts a plaintiff would have to conduct its own factual investigation and discovery proceedings because the Antitrust Division had not made out a case in respect of such contracts.

Tierney further states that petitioner had decided to incur the cost of litigation rather than settle any claim with respect to negotiated or nontargeted bid contracts unless the plaintiff advancing that claim agreed to settle it under the Marathon formula at an average rate per dollar of contract revenue that was less than one-tenth of the rate at which petitioner would settle claims relating to targeted bid contracts. The unregulated plaintiffs in the Clayton Act case ultimately agreed to accept petitioner's proposal to settle claims on nontargeted bid contracts and negotiated contracts for amounts ranging from .125 to 2 percent of contract price.

The complaint filed by Marathon states the "Nature of Case" to be as follows:

This is an antitrust case brought under Section 1 of the Sherman Antitrust Act (15 U.S.C. sec. 1), in which Plaintiffs seek treble damages, costs and attorney's fees because of the injuries Plaintiffs suffered in their business and property by reason of an unlawful conspiracy between the Defendants under which they unlawfully allocated customers and markets, fixed prices to be charged for their goods and services, and *rigged bids* on construction projects in an unreasonable restraint of interstate and foreign trade and commerce. [Emphasis added.]

The complaint recites that it is filed under section 4 of the Clayton Act, 15 U.S.C. sec. 15, for the recovery of treble dam-

ages for injury to Marathon's business and property by reason of defendants' violation of section 1 of the Sherman Act. Further on, the complaint recites that

Companies requiring the services of marine construction firms usually prepare plans and specifications covering proposed marine construction projects and select a marine construction firm to perform the work required by a given project *by inviting competitive bids or by negotiating* with one or more marine construction firms believed to be capable and available to perform the project. [Emphasis added.]

The complaint alleged, among other things, that the defendants designated the company that was to be the successful bidder, or which was to negotiate with the owner, on projects made subject to the aforesaid combination and conspiracy. The complaint further alleged that the defendants adopted and followed the practice whereby one defendant submitted intentionally high or complementary bids and, in some cases, intentionally refrained from bidding or negotiating altogether on projects for which the other defendant had been designated the successful bidder or which had been assigned to the other defendant pursuant to the unlawful combination and conspiracy.

## *Discussion*

Section 162(g) provides:

SEC. 162(g). TREBLE DAMAGE PAYMENTS UNDER THE ANTITRUST LAWS.— If in a criminal proceeding a taxpayer is convicted of a violation of the antitrust laws, or his plea of guilty or nolo contendere to an indictment or information charging such a violation is entered or accepted in such a proceeding, no deduction shall be allowed under subsection (a) for two-thirds of any amount paid or incurred—

(1) on any judgment for damages entered against the taxpayer under section 4 of the Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes", approved October 15, 1914 (commonly known as the Clayton Act), on account of such violation or any related violation of the antitrust laws which occurred prior to the date of the final judgment of such conviction, or

(2) in settlement of any action brought under such section 4 on account of such violation or related violation.

The preceding sentence shall not apply with respect to any conviction or plea before January 1, 1970, or to any conviction or plea on or after such date in a new trial following an appeal of a conviction before such date.

Thus, section 162(g) disallows deductions under section 162(a) for two-thirds of any damages paid under section 4 of the Clayton Act, whether the action is settled or goes to judgment, where the taxpayer is convicted or pleads guilty or nolo contendere to an indictment or information charging a violation of the antitrust laws. See Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 20.3.6, at 20-57 (2d ed. 1989). Under section 162(g)(2) the disallowance of two-thirds of the damages paid comes into play if the settlement of the action brought under section 4 of the Clayton Act is "on account of" the criminal "violation" or "related violation".

This case squarely presents, for the first time in this Court, the question of the scope of the words "on account of such violation" as used in section 162(g). (Paragraphs (1) and (2) of section 162(g) both use the term "on account of such violation" in connection with the payment of damages upon the conclusion of a Clayton Act case.) Cf. *Fisher Cos. v. Commissioner,* 84 T.C. 1319 (1985), affd. without published opinion 806 F.2d 263 (9th Cir. 1986); *Federal Paper Board Co. v. Commissioner,* 90 T.C. 1011 (1988). *Fisher Cos.* involved the "related action" phrase in section 162(g), which is not implicated in this case. In *Federal Paper Board Co.,* discussed *infra,* we focused on other aspects of section 162(g) without deeming it necessary to analyze the words under scrutiny here.

Petitioner concedes that section 162(g) applies to amounts paid or incurred by petitioner to settle treble damage claims in connection with the projects listed in the bill of particulars. As set out above, petitioner paid 7.5 percent of the targeted bid contract prices of the unregulated petitioners to settle their claims. Petitioner concedes that these payments fall under section 162(g). Petitioner argues, however, that it was not indicted for, nor did its nolo contendere plea extend to, Sherman Act violations in respect of negotiated contracts or nontargeted bid contracts, and that settlement payments made with respect thereto are fully deductible under section 162(a). Petitioner does not suggest how settlement payments to the regulated plaintiffs should be treated.

Respondent argues that the deduction for all settlement payments is subject to the limitations of section 162(g).

Section 162(g) was added to the Internal Revenue Code by section 902(a) of the Tax Reform Act of 1969; Pub. L. 91-172, 83 Stat. 710 (TRA 1969). The Senate report accompanying TRA 1969 explained that the denial of the deduction for treble damage payments is limited to two-thirds of the amount paid or incurred since this represents the "penal" portion of the payment. S. Rept. 91-552 (1969), 1969-3 C.B. 597. The Senate report makes it clear that the partial disallowance applies in those cases where section 4 of the Clayton Act claims is tied to "hard-core" violations, where intent has been clearly proved in a criminal proceeding.

Petitioner argues strenuously that the disallowance in the case before us must therefore be limited to petitioner's collusive conduct in bid rigging, and then only as to those violations listed in the bill of particulars. This is because count 1 of the indictment to which petitioner pleaded nolo focused only on bid rigging, and not on negotiated contracts. Furthermore, petitioner argues, the bid contracts not listed in the bill of particulars were not targeted by the Antitrust Division, so could not have been the subject of petitioner's nolo plea.

Petitioner asserts that the settlement percentages applied to the proceeds of negotiated contracts and nontargeted bid contracts to settle claims in respect of those contracts were nuisance value percentages averaging less than one-tenth of the settlement percentage applied to the proceeds of the targeted bid contracts. This argument is supported by the affidavit of Michael P. Tierney, one of three persons authorized by petitioner to state its position with respect to each claim made against petitioner during settlement negotiations in the Clayton Act case.

Petitioner appears to be making its nuisance value argument to avoid any inference that settlement of the nontargeted contracts constituted an admission on petitioner's part that these contracts were part of the subject matter of count 1 of the indictment and therefore fatally linked to petitioner's nolo plea. Since only documents supporting the bill of particulars were placed in the depository and were readily available to the Clayton Act plaintiffs, petitioner's counsel were well aware that the plaintiffs' trial preparation would have been far more burdensome in the nontargeted contract cases than in the targeted contract cases. Therefore,

petitioner determined to push the nontargeted claimants to trial if they were unwilling to accept the so-called nuisance settlements.

The monetary significance of the amounts paid to settle claims arising from the negotiated and nontargeted bid contracts cannot be determined from the record. Nevertheless, given the size of the overall settlement payments by petitioner to the unregulated plaintiffs, $80,959,034, the so-called nuisance settlements were likely to have been substantial.

We have held that it is the origin and nature of the claims, and not petitioner's settlement motives, that determine the status of Clayton Act claim payments for purposes of section 162(g). *Federal Paper Board Co. v. Commissioner, supra* at 1023; cf. *United States v. Burke,* 504 U.S. ____, 112 S. Ct. 1867 (1992) (applying nature of claim rationale to backpay award in sex discrimination settlement for purposes of section 104). We therefore must consider the relationship, if any, of each of the three types of Clayton Act claims to the Sherman Act violation (beyond the targeted bid contract claims) to determine the applicability of section 162(g) to each.

An unreported District Court case, *Flintkote Co. v. United States,* 68 AFTR 2d 91-5570, 91-2 USTC par. 50,435 (N.D. Cal. 1991), considered the use of the words "on account of such violation" in section 162(g), and concluded that "the issue is the scope of the conduct to which * * * [taxpayer] admitted in the criminal proceeding, and whether that conduct is essentially co-extensive with the conduct that gave rise to the civil settlement." We agree with this standard for measuring section 162(g) applicability, and we apply it here.

As to the nontargeted bid contract claims, we think petitioner's reliance upon the bill of particulars to establish a line of demarcation is misplaced. At a minimum petitioner pleaded nolo to the charge in count 1 of the indictment that it had engaged in collusive conduct in bid rigging. The plea was entered on the day the indictment was returned, and judgment was signed by the District Court judge on the same day and entered 4 days later, on December 18, 1978. It was not until March 14, 1979, that the Antitrust Division, responding to a motion by several of the individual defendants, produced the bill of particulars. And, as we have noted,

the Antitrust Division expressly reserved the right to amend and augment the particulars at a later date. Thus, petitioner pleaded nolo to collusive bid rigging, not to collusive bid rigging of specific contracts enumerated in a bill of particulars then at hand. At the time petitioner entered its nolo plea, it could have had no way of knowing specifically which of its bid contracts would later be targeted.

Marathon, in its Clayton Act complaint, charged petitioner with, among other things, collusive bid rigging. No distinction is made in the complaint between targeted bid contracts and nontargeted bid contracts. There is no way of determining from the record before us why the Antitrust Division chose, in responding to the individual defendants' motion, to target some bid contracts and not others, but factors such as size, easy availability of documentary proof, and the like may have influenced the decision.

We are aware of the reasons given by the Government in resisting an individual defendant's motion to seal the bill of particulars. Among other things, the Government commented that publication of the bill of particulars would limit the general allegations of the indictment and show that not all of the business of the two corporate defendants was allegedly rigged. But, particularly in light of the Government's reservation of the right to augment the bill of particulars at a later date, we do not understand it to be saying that the list of contracts targeted in the bill was all-inclusive. And we further observe that nolo pleas by all of the individual defendants obviated any necessity for augmenting the particulars. What conclusions the public might have drawn from reading the bill of particulars, and what petitioner pleaded to, are not one and the same.

Furthermore, at the time petitioner pleaded nolo it must have been aware of the extreme likelihood that numerous Clayton Act suits would follow in the train of the Sherman Act plea and conviction, which of course is exactly what happened. Before entering the plea petitioner might materially have affected the tax consequences flowing from the civil suits by itself moving for a bill of particulars, and by attempting to negotiate a limitation of the scope of its nolo plea to the contracts targeted therein.

A somewhat analogous situation presented itself in *Flintkote Co. v. United States, supra.* In that case a corporate

defendant in a Sherman Act case (the taxpayer in a subsequent refund suit) pleaded nolo contendere to charges of price fixing which began sometime prior to 1960 and continued to sometime in 1973. At the time the plea was entered the taxpayer had settled for $3.5 million a Clayton Act claim which arose from the misconduct giving rise to the criminal indictment. The criminal antitrust statute has a 5-year limitations period. Since most of the $3.5 million settlement related to pre-1968 activities, the taxpayer argued that most of it was paid to rectify conduct that was not indictable in 1973, and was therefore fully deductible and not limited by section 162(g).

The District Court in *Flintkote,* referring to the taxpayer's failure to limit its plea as "an unnecessary tactical error", concluded that taxpayer had ample opportunity to consider the tax consequences of its plea and adjust its plea accordingly, but did not do so. We think the same logic applies in this case. Petitioner could have moved for a bill of particulars of its own, and thereafter sought to limit its plea accordingly, but failed to do so. It may not now bootstrap its position onto another defendant's subsequently obtained bill of particulars so as to ameliorate the tax consequences of its conduct.

Nor are we persuaded by petitioner's argument that payments in settlement of claims arising from nontargeted contracts were "nuisance" settlements which were not necessarily an admission that these settlements were "on account of" the same misconduct that was charged in the indictment. Under the Marathon formula, petitioner settled the targeted bid contract claims for 7.5 percent of the amounts received, and the nontargeted bid and negotiated contract claims for amounts ranging downward from 2 percent to one-quarter of 1 percent of the amounts received, and omitting entirely claims of $100,000 or less.

As we have stated, the amounts paid to settle claims of the unregulated plaintiffs in each of the various categories (totaling overall $80,959,034) cannot be determined from the record, although the amounts involved in settling the nontargeted claims apparently remain sufficiently significant to warrant the litigation of this remaining issue in this case. For what it may also be worth we observe that in each instance petitioner settled the nontargeted bid contract claims in each Marathon formula category for exactly twice

the amount of settlement of the negotiated contract claims. In doing so, petitioner must have had some concern that the Clayton Act plaintiffs had some chance of success in establishing that these nontargeted bid contract claims could be tied to collusive bid rigging, the "violation" admitted to in the criminal case.

We accordingly conclude that petitioner's asserted reasons for settling the nontargeted bid contracts do not control the question of whether the settlement of these contracts was "on account of such violation" referred to in section 162(g). Applying the standard previously enunciated, we hold that the scope of the conduct to which petitioner admitted in the criminal proceeding is essentially coextensive with the conduct that gave rise to the civil settlement of the nontargeted bid contracts.

We turn now to the question of the $13 million settlement of the regulated plaintiff claims. Petitioner proposed to apply the Marathon formula to these claims, but certain of the regulated plaintiffs declined to accept this approach.

The monetary value of the settlement of the claim of each of the 14 regulated plaintiffs is listed on an annex to the regulated plaintiff agreement, but the type of contract or contracts cannot be ascertained from the record. Some of the regulated plaintiffs and some, possibly all, of the claims of these regulated plaintiffs are listed in the bill of particulars. We understand that petitioner concedes that the targeted bid claims of the regulated plaintiffs, in addition to the targeted bid claims of the unregulated plaintiffs, fall within the ambit of section 162(g).

Petitioner and B&R appear simply to have made monetary settlements as to each regulated plaintiff without attempting to allocate a specific dollar amount to any specific category of contract. On brief, petitioner does not specifically discuss the regulated plaintiff settlements vis-a-vis section 162(g).

Taking all of these factors into account we hold that the payments which petitioner made in settlement of the claims of the regulated plaintiffs are subject in their entirety to the provisions of section 162(g).

Lastly we turn to the payment of the negotiated contract claims, as to which we take a different view. The indictment charged the defendants and certain unindicted coconspirators with engaging in a long-continuing combination and conspir-

acy to suppress and eliminate competition in marine construction in the Gulf of Mexico and elsewhere. The Marathon complaint alleged that the corporate defendants violated the Federal antitrust laws by, among other things, designating the company which was to be the successful bidder, or which was to negotiate with the owner, on projects made subject to the alleged combination and conspiracy. The complaint also charged that the corporate defendants furthered the alleged combination and conspiracy by, in some cases, intentionally refraining from bidding or negotiating altogether.

While in the broadest sense the alleged "negotiating" conduct was on account of the related Sherman Act violation, we think more precision is required. We repeat that we agree with the District Court's holding in *Flintkote Co. v. United States,* 68 AFTR 2d 91-5570, 91-2 USTC par. 50,435 (N.D. Cal. 1991), that the conduct to which a Sherman Act defendant admitted in the criminal proceeding must be essentially coextensive with the conduct that gave rise to the civil settlement. While the offense charged in count 1 of the indictment was a broadly phrased charge of an anticompetitive combination and conspiracy on the part of all defendants, the centerpiece of the charge was the submission by the defendants of collusive, noncompetitive, and rigged bids. We think this is the only conduct to which petitioner admitted in its nolo plea which is coextensive with the civil settlements. We also think this holding is consistent with the Senate report's indication that claims under section 4 of the Clayton Act are to be limited to hardcore violations where intent has been clearly proved in a criminal proceeding. Such intent is, to our thinking, not clearly proved insofar as the negotiated contract claims are concerned.

In *Federal Paper Board Co. v. Commissioner,* 90 T.C. 1011 (1988), the taxpayer and 22 other corporations were indicted for illegally engaging in a conspiracy to fix the prices of folding cartons, to which charge the taxpayer entered a nolo plea. A subsequent Clayton Act case sought triple damages from the defendants, including the taxpayer, accusing them of engaging in a conspiracy to fix the prices of both folding cartons and milk cartons. Although the taxpayer did not manufacture milk cartons, it agreed to participate in a settle-

ment of Clayton Act claims based upon both folding carton and milk carton claims.

On the foregoing facts, and without discussion of the "on account of such violation" language of section 162(g), we allocated the settlement between the folding carton and milk carton violations, applying section 162(g) only to the former. We think our holding in this case in regard to the negotiated contract claims is consistent with the approach taken in *Federal Paper Board.* Specifically, we hold that the amounts paid by petitioner in settlement of the negotiated contract claims are deductible in full under section 162(a), and are not limited in amount by section 162(g).

For the first time, in its reply memorandum of law petitioner argues that respondent is judicially estopped to maintain the position she has advanced in this case which, petitioner asserts, is in conflict with a position argued by the Department of Justice in the criminal case. Petitioner argues that the Department of Justice, in its "Opposition" to one of the individual defendants motion to seal the bill of particulars, stated that the bill would "simply serve to define the conspiracy alleged in the indictment." Therefore, says petitioner, respondent may not now broaden the application of section 162(g) to include contracts outside those listed in the bill of particulars.

We are not persuaded. Having failed to seek its own bill of particulars in the criminal case (as we have already discussed), by its estoppel argument petitioner again seeks to bootstrap its position by piggybacking onto the bill of particulars obtained by the individual defendants in their cases, well after petitioner and B&R had entered their nolo pleas in their own cases. We also reiterate that the Department of Justice expressly reserved its right to augment the bill of particulars at a later date if it saw fit to do so. Boiled down to its essentials, petitioner's estoppel argument is simply a rehashing of petitioner's other arguments, which we decline to readdress at this point.

As noted previously, the amounts paid in settlement of the negotiated contract claims of the nonregulated plaintiffs cannot be determined from the record. If the parties are unable

to agree as to these amounts, petitioner may file a motion to reopen the record to submit evidence with regard thereto.

To reflect the foregoing,

> *An appropriate order will be issued granting petitioner's motion for partial summary judgment in part and denying such motion in part and granting respondent's cross-motion for partial summary judgment in part and denying such motion in part.*